## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PATRICK W. GAYNOR,

               Plaintiff,

   v.

CITY OF MERIDEN and
JEFFRY COSSETTE,

               Defendants.

Civil Action No. 3:17-cv-1103 (CSH)

**APRIL 18, 2022**

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Plaintiff Patrick Gaynor, formerly an officer of the Police Department of Defendant City of Meriden, Connecticut ("Meriden"), brought this action against Meriden and co-Defendant Jeffry Cossette, chief of the Police Department. Plaintiff alleges that Defendants' termination of his employment by Meriden was in retaliation for Plaintiff's protected speech, in violation of the United States Constitution and the Connecticut Constitution. Defendants deny any liability.

Following discovery, Defendants move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Plaintiff resists that motion. This Ruling resolves the motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The pleadings, parties' Local Rule 56(a) statements, discovery, and material subject to judicial notice reveal the following facts that are undisputed or indisputable.

1

On August 5, 1996, the Plaintiff, Patrick Gaynor, was hired by Defendant City of Meriden as an officer in the Meriden Police Department. Defs.' Local 56(a)(1) Statement of Undisputed Material Facts ¶ 1 ("Defs.' 56(a)"), ECF No. 55-1; Pl.'s Local Rule 56(a)(2) Statement of Facts in Opp'n to Summ. J. ¶ 1 ("Pl.'s 56(a)"), ECF 58-1. Meriden terminated Gaynor's employment on June 26, 2017. Defs.' 56(a) ¶ 39; Pl.'s 56(a) ¶ 39. During the interim Gaynor rose through the ranks of the Police Department. Defs.' 56(a) ¶ 1; Pl.'s 56(a) ¶ 1. Gaynor was a captain and a senior commander of Department operations when he was terminated, in circumstances which give rise to this action. Defs.' 56(a) ¶ 1; Pl.'s 56(a) ¶ 1.

At all times pertinent to the action, Defendant Jeffry Cossette was Chief of the Meriden Police Department. *See generally* Defs.' 56(a); Pl.'s 56(a).

Jeffry Cossette has a son named Evan Cossette. Defs.' 56(a) ¶ 2; Pl.'s 56(a) ¶ 2. In 2010, Evan Cossette was an officer in the Meriden Police Department. Defs.' 56(a) ¶ 2; Pl.'s 56(a) ¶ 2. Gaynor, at that time the president of the Meriden Police Union, was made aware of a cell bock video showing that Evan Cossette had assaulted a handcuffed prisoner. Defs.' 56(a) ¶¶ 2, 7; Pl.'s 56(a) ¶ 2. Gaynor reported that video up the Department chain of command, and subsequently testified at the federal criminal trial of Evan Cossette in this Court arising out of the incident. Defs.' 56(a) ¶¶ 7–12; Pl.'s 56(a) ¶¶ 7–12. Evan Cossette was found guilty at that trial on June 4, 2013, and was incarcerated. Compl. ¶ 12, ECF No. 1; Answer ¶ 12, ECF No. 16.

The gravamen of Gaynor's instant action in this Court against Meriden and Jeffry Cossette, as alleged in his Complaint, is that "[f]rom June 2013 the defendant Cossette began a systematic effort to retaliate against the plaintiff for having testified against his son." Compl. ¶ 15. Police Department actions which Gaynor regarded as adverse and retaliatory prompted him, on September 1, 2016, to file "a formal [internal] complaint asserting that defendant Cossette

was retaliating against him because of his testimony for the United States in this court" (a reference to the trial of Evan Cossette). Compl. ¶ 19. (Gaynor's internal complaint is referred to herein as the "September 2016 complaint.") Gaynor further alleges: "On June 26, 2017, the plaintiff's employment was terminated for the express reason that he had filed his aforesaid complaint of retaliation against defendant Cossette." Compl. ¶ 23.

The theory of Gaynor's case against Meriden and Jeffry Cossette is that Gaynor's declarations and trial testimony about the incident involving Evan Cossette, and his subsequent complaint against Jeffry Cossette, were protected speech, so that Defendants' termination of Gaynor's employment because of that speech was constitutionally impermissible.[1] *See* Compl. ¶¶ 10, 15, 19–20, 22–23, 26. Gaynor also argues that Defendants took actions before his termination—which included denying him training opportunities, giving him negative employment evaluations, ordering him not to speak to the media, and placing him on administrative leave pending an internal affairs investigation—that likewise constituted impermissible retaliation. Compl. ¶¶ 15–17, 20–22.

The Defendants' theory of the case is that Meriden terminated Gaynor's employment for just cause, for reasons having nothing to do with the sort of retaliation Gaynor alleges, which Defendants deny occurred. *See* Defs.' 56(a) ¶¶ 31–36, 38–39; Mem. of Law in Supp. of Defs.'

---

[1] Gaynor's response to Defendants' motion for summary judgment states, "Defendants' baseless arguments completely disregard the September 1, 2016 complaint which is the protected speech at issue[] in the instant action[;] instead they would have the Court believe the plaintiff's testimony in the 2013 trial of Evan Cossette is the basis for this suit." Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 2–3, ECF No. 58. Defendants argue in their reply that this amounts to a concession that the only purportedly protected speech is Gaynor's internal September 1, 2016 complaint. Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Defs.' Reply") 4, ECF No. 65. For purposes of this ruling, the Court does not treat Gaynor's statement in opposition as a concession and considers whether any of the following constitute protected speech: Gaynor's internal reporting of the video, Gaynor's testimony in the federal investigation and trial of Evan Cossette, Gaynor's September 2016 complaint, and Gaynor's supplement to that complaint.

Mot. for Summ. J. ("Defs.' Mem.") 9–12, ECF No. 55-2. Chief among Meriden's cited reasons for terminating Gaynor's employment are (1) an alleged "pattern of untruths and reckless disregard for the truth" made by Gaynor and (2) the undisputed fact that Gaynor signed himself up for a training course, at a total cost to the City of $4,165, despite being previously told by Chief Jeffry Cossette that he should not do so, for both budgetary and personnel reasons. *See* Defs.' Exh. 1, Arbitration Award ("Arb'n Award") 4, 14 ECF No. 81-1. In addition, Defendants argue that neither Gaynor's initial reporting of the Evan Cossette incident nor his internal complaint against Jeffrey Cossette constitute protected speech, and that other than Gaynor's termination, the actions taken against Gaynor are factually mischaracterized and fall short of the threshold for adverse employment action. *See* Defs.' Mem. 20–27.

Following Gaynor's termination on June 26, 2017, his union filed a grievance under the collective bargaining agreement with the City of Meriden. Defs.' Ex. 2, Mem. of Decision Re: Pl.'s Appl. to Confirm Arbitration Award and Def.'s Appl. to Vacate Arbitration Award 2 (filed at *City of Meriden v. Am. Fed'n of State, Cnty. and Mun. Emps.*, NNH CV 206102381S (REY), 2021 WL 828549 (Conn. Super. Ct. New Haven Judicial Dist. Jan. 4, 2021) ("Super. Ct. Op.")), ECF No. 81-2. The claims Gaynor asserted, as the grievant in that grievance proceeding against Meriden, mirror the claims of unconstitutional retaliation Gaynor asserts against Meriden and Jeffry Cossette in the case at bar. *See generally* Arb'n Award.

Gaynor's claims in the grievance proceeding were submitted to arbitration before a three-member panel of arbitrators, comprised of a Management Member, a Labor Member, and a Chairman. Arb'n Award 1. Gaynor declined union representation and retained his own counsel. Super. Ct. Op. 3. Gaynor and the City stipulated that the question submitted to the arbitration

panel was: "Whether the City had just cause to terminate the employment of Officer Patrick Gaynor?" *Id.* The submission was unrestricted. *Id.*

The panel conducted a protracted evidentiary hearing extending over the course of twelve separate days, the first hearing date occurring on November 3, 2017 and the last hearing date being May 23, 2019. *Id.* The procedure employed was thorough and demanding. The panel's award, dated March 10, 2020, recites, "The termination of any employee is a serious matter," and, "The termination of a police captain with 20 years of service who was personally involved in the arrest and conviction of the Chief's son requires an especially high degree of scrutiny." Arb'n Award 1, 13. In consequence, the award notes, "The grievant [Gaynor] was provided with an extraordinarily wide latitude over the twelve days of hearings to provide any evidence, even with the most tangential relevance, to rebut the City's evidence supporting its decision to terminate his employment." *Id.* 13.

The sixteen-page arbitration award concludes: "The termination of Patrick Gaynor was for just cause." *Id.* The award states in detail its reasons for deciding each of the numerous claims and issues presented during the extended hearings. *See id.* 12–13. It is signed by two of the three arbitrators in the panel: the Chairman and the Management Member. *Id.* 16. The Labor Member noted "Dissent" next to his signature, but apparently did not submit a separate opinion. *See id.*

Subsequently, the parties filed cross-applications with the Connecticut Superior Court: Meriden applied to confirm the arbitration award, and Gaynor cross-applied to vacate it. Super. Ct. Op. 3. Superior Court Judge Robert E. Young issued an order, dated and filed on January 4, 2021, which granted Meriden's application to confirm the arbitration award and denied Gaynor's

application to vacate the award. Super. Ct. Op. 2, 8. Gaynor has appealed to the Connecticut

Appellate Court from that order. *See City of Meriden v. Am. Fed'n of State, Cnty. and Mun.

Emps.*, AC 44483 (Conn. App. Ct.). The appeal is pending. *See* STATE OF CONNECTICUT

JUDICIAL BRANCH APPELLATE/SUPREME CASE LOOK-UP, appellateinquiry.jud.ct.gov/CaseDetail.

aspx?CRN=74611&Type=PartyName (last visited Apr. 18, 2022).

Defendants Meriden and Jeffry Cossette now move for summary judgment dismissing

Gaynor's federal action against them. Defs.' Mem. 40.


## II. STANDARD OF REVIEW

Defendants' motion is made under Rule 56(a) of the Federal Rules of Civil Procedure,

which provides: "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."

This standard "provides that the mere existence of *some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, *Inc.*,

477 U.S. 242, 247–48 (1986) (emphases in original).

"As to materiality, the substantive law will identify which facts are material. Only

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

A district judge adjudicating a motion for summary judgment must perform "the

threshold inquiry of determining whether there is the need for a trial—whether, in other words,

there are any genuine factual issues that can properly be resolved only by a finder of fact because

they may reasonably be resolved in favor of either party," a circumstance that is not presented "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation and quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## III. DISCUSSION

### A. Nature of Gaynor's Claims

Gaynor's claims implicate the First Amendment to the U.S. Constitution as enforced by 42 U.S.C. §§ 1983 and 1988, and Article First, Sections 3, 4, and 14 of the Connecticut Constitution[2] as enforced by Section 31-51q of the Connecticut General Statutes. *See* Compl. ¶¶ 26–29.

Section 1983 provides a private right of action against state and local government officials for Constitutional violations:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citation and quotation marks omitted).

To state a First Amendment retaliation claim sufficient to withstand a motion for summary judgment, the plaintiff must set forth evidence demonstrating "(1) that the speech at issue was protected; (2) that [the plaintiff] suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action."

---

[2] Article 1, section 3 of the Connecticut Constitution states: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state." Article 1, section 4 states: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article 1, section 14 states: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

*Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006). "Even if the plaintiff demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of the protected conduct." *Id.* at 251–52 (citation and quotation marks omitted).

Whether a government employee's speech is protected depends, in part, on whether the employee speaks on "matters of public concern." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 573–74 (1968); *see also Cotarelo*, 460 F.3d at 252. "Generally, speech on 'any matter of political, social, or other concern to the community is protected.'" *Cotarelo*, 460 F.3d at 252 (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (finding that police officer comments on crime rates, police staffing, equipment shortages, and budget matters were of public concern)).

But if the employee speaks on a purely private matter of personal concern—such as dissatisfaction with the conditions of employment—then the speech is not protected. *Connick v. Myers*, 461 U.S. 138, 147–149 (1983). Nor is it protected if the employee speaks "pursuant to employment responsibilities"—for instance, by writing an official memorandum to a supervisor pursuant to the employee's job duties. *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006). Even if speech is on a matter of public concern, it is not necessarily protected if the government had "'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer." *Lane v. Franks*, 573 U.S. 228, 242 (2014) (quoting *Garcetti*, 547 U.S. at 418). The *Pickering* test is, therefore, a balancing test, in which the government may point to a "government interest"—e.g., that the speech at issue was

erroneous or involved the disclosure of sensitive information—"that tips the balance in their favor." *Lane*, 573 U.S. at 242.

A public employee's truthful sworn testimony before a grand jury or at a criminal trial constitutes speech as a citizen protected by the First Amendment, "even when the testimony relates to his public employment or concerns information learned during that employment." *Lane*, 573 U.S. at 238.

Section 31-51q of the Connecticut General Statutes similarly prohibits "discipline or discharge on account of the exercise by [an] employee of rights guaranteed by the [F]irst [A]mendment to the United States Constitution or [S]ection 3, 4[,] or 14 of [A]rticle [F]irst of the [Connecticut] Constitution." Conn. Gen. Stat. § 31-51q (West); *see also D'Angelo v. McGoldrick*, 685 A.2d 319, 322 (Conn. 1996). To succeed on a claim under Section 31–51q, plaintiffs must allege "(1) that they were exercising rights protected by the [F]irst [A]mendment to the United States [C]onstitution or an equivalent provision of the Connecticut Constitution; (2) that [retaliatory action occurred] on account of their exercise of [such] rights; and (3) that their exercise of [such] rights did not substantially or materially interfere with their bona fide job performance or with their working relationship with their employer." *D'Angelo*, 685 A.2d at 322; *see also Trusz v. UBS Realty Invs.*, No. 3:09cv268 (JBA), 2010 WL 1287148, at *9 (D. Conn. Mar. 30, 2010); *Ozols v. Town of Madison*, No. 3:11cv1324 (SRU), 2012 WL 3595130, at *3 (D. Conn. Aug. 20, 2012).

The Connecticut Supreme Court has held that the Connecticut Constitution provides slightly broader protections for public employees than does the U.S. Constitution. *Trusz v. UBS Realty Invs.*, 123 A.3d 1212, 1228 (Conn. 2015) (answering a question certified from this Court). While otherwise co-extensive with the First Amendment, Connecticut's constitutional protec-

tions diverge from the federal standard in *Garcetti* in that a public employee making official communications may prevail under the Connecticut Constitution when "he speaks on a matter of unusual importance and satisfies high standards of responsibility in the ways he does it." *Id.* (quoting Justice Souter's dissenting opinion in *Garcetti*, 547 U.S. at 434). Such matters of "unusual importance" include "only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety." *Id.* (again quoting Justice Souter's dissent). *Cf. Ozols*, 2012 WL 3595130, at *4–5. Thus, while the claim under Section 31-51q of a violation of the Connecticut Constitution raises nearly identical issues to those brought under the First Amendment, the state claim will be analyzed under "Justice Souter's modified *Pickering*/*Connick* balancing test" as articulated by the Connecticut Supreme Court. *Trusz*, 123 A.3d at 1231–32.

### B. Effect of an Arbitration Award on Litigation

Applying these standards to the case at bar, one must begin with a consideration of the effect of the arbitration award in Defendants' favor upon the fortunes of the parties in this federal case.

The Defendants do not contend, in support of their motion for summary judgment, that the arbitration award in Meriden's favor squarely precludes Gaynor's federal action against Meriden and Cossette. *See* Defs.' Second Mot. for Leave to Suppl. their Mot. for Summ. J. ("Defs.' Mot. to Suppl.") 2, ECF No. 81. Their reticence is well founded, given authoritative decisions that "an arbitration award does not have preclusive effect in federal court." *Miceli v. Mehr*, No. 3:17-cv-00029, 2019 WL 5727387, at *9 n.3  (D. Conn. Nov. 5, 2019) (citing and quoting Title VII cases, *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49 (1974), and *Collins*

*v. N.Y.C. Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002). However, an arbitration award adverse to a plaintiff asserting a federal statutory claim may be given significant weight by a federal trial judge in relation to "the degree of procedural fairness in the arbitral forum" and the "adequacy of the record with respect to the issue . . . ." *Alexander*, 415 U.S. at 60 n.21. It is "especially" appropriate for a court to accord "great weight" to the arbitral determination "where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record." *Id.*

The Second Circuit's analysis in *Collins* is instructive and worth quoting at some length. The court held that "a negative arbitration decision rendered under a [collective bargaining agreement] does not preclude a Title VII action by a discharged employee[,]" 305 F.3d at 119, and went on to say:

> However, a decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link. Where, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised. Here, however, the tribunal received all the available evidence in an even-handed proceeding and rendered a decision consistent with the almost overwhelming evidence of appellant's assault on Badr."

*Id*.

The plaintiff in *Collins,* whose complaint for wrongful termination had been dismissed by the district court on summary judgment, lost his appeal because, in the Second Circuit's view, plaintiff's termination occurred "only after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the

termination. This fact is highly probative of the absence of discriminatory intent in that termination." *Id*. The Second Circuit concluded:

> Collins has offered insufficient evidence of causation linking his termination to motives of retaliation or discrimination to overcome the cumulative probative weight of the evidence of a legitimate reason for his discharge and of the final termination decision by the arbitration board. While appellant may have proffered (barely) enough evidence to create an issue of fact over whether Badr faked the assault for discriminatory or retaliatory purposes, that proffer is not sufficient to overcome the additional probative weight of the arbitration award allowing his termination.

*Id*. (citations omitted). The Second Circuit affirmed the district court's grant of summary judgment to the defendant. *Id*.

Subsequently, in *Morel v. Am. Bldg. Maint. Co.*, 124 F. App'x 671, 672 (2d Cir. 2005) (summary order), the Second Circuit said: "The fact that an adverse arbitral award on an employment discrimination claim does not preclude a Title VII action does not render the award irrelevant to plaintiff's pursuit of judicial relief." The court of appeals' decision in *Morel* then cites and quotes the same language from *Collins*, saying: "Thus, 'to survive a motion for summary judgment' based on insufficient evidence to raise a triable issue of fact, a plaintiff who has failed in arbitration 'must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised.'" *Id.* (citing and quoting *Collins*). In *Morel,* the Second Circuit vacated the district court's grant of defendant's motion for summary judgment based solely upon the asserted preclusive effect of the arbitral award, and remanded the case for further proceedings

13

because "the district court has not yet had occasion to consider whether the plaintiff can adduce such evidence" as that described in *Collins*. *Id.*[3]

The plaintiffs in *Collins* and *Morel* asserted claims of race-based and retaliatory discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Gaynor's claims against Meriden and Cossette do not invoke Title VII. Gaynor's claims against these Defendants are that they retaliated against him and terminated his employment because of his protected speech, in violation of the First Amendment to the United States Constitution and Article First of the Connecticut Constitution. Compl. ¶ 26. However, the Second Circuit's reasoned analysis in *Collins* and *Morel* of the effect of an adverse arbitration award upon those plaintiffs' federal Title VII claims is applicable to this plaintiff's claims under the First Amendment and analogous state constitutional provisions. *Cf. Beaton v. Metro. Transp. Auth. N.Y.C. Transit*, 15 Civ. 8056 (ER), 2018 WL 1276863, at *8 n.5 (S.D.N.Y. Mar. 2, 2018) (applying the *Collins* approach to a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*.); *Young v. Benjamin Dev. Co.*, No. 09 Civ. 10209 (RJS), 2009 WL 498933, at *4 (S.D.N.Y. Feb. 17, 2009) (same); *Timmel v. W. Valley Nuclear Servs. Co.*, No. 09-CV-5S (WMS), 2011 WL 5597350, at *6 (W.D.N.Y. Nov. 17, 2011) (applying *Collins* to claims under the ADA and the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq*.). There is no discernible reason why arbitration awards should be treated differently by district courts in First Amendment litigation.

---

[3] On remand, the district court (Sweet, *Judge*) granted defendant's motion for summary judgment in part and dismissed certain claims asserted by the plaintiff, and denied the motion as to other claims, which went forward. *Morel v. ABM Co.*, No. 02 Civ. 3564 (RWS), 2006 WL 3771006, at *12 (S.D.N.Y. Dec. 19, 2006).

### C. Application of the Arbitration Award in This Case

The Second Circuit's analysis in *Collins* of the effect of an arbitration award adverse to the plaintiff upon that plaintiff's effort to litigate the same claims in federal court is instructive in the case at bar, because the arbitration proceeding and award in *Collins* closely resemble those in this case.

The Second Circuit stressed in *Collins* that the arbitration award was "a decision by an independent tribunal" following "an evidentiary hearing and is based on substantial evidence." 305 F.3d at 119. The award in the arbitration between Gaynor and Meriden was signed by the Chairman of the panel, Dennis Murphy, and by Marc Mandell, designated as the "Management Member." Arb'n Award 16. The "Labor Member," Jeffrey Scanlon, wrote the word "Dissent" after his signature. *Id.* Plaintiff's briefs make much of the fact that the award was not unanimous, *see, e.g.*, Pl.'s Obj. to Defs.' Mot. for Leave to Suppl. the Mot. for Summ. J. ("Pl.'s Obj. to Defs.' Mot. to Suppl.") 1, ECF No. 64, but there is no substance to the point. A majority award is fully effective. *Cf. Miceli v. Mehr*, No. 3:17-cv-00029 (VAB), 2019 WL 5727387, at *13 (D. Conn. Nov. 5, 2019), (finding plaintiff raised no genuine issue of material fact where "a *majority* of the [Arbitration] Panel found the Town had just cause to terminate" plaintiff (emphasis added)), *aff'd*, 830 F. App'x 63 (2d Cir. 2020). If a judgment of mine is reversed by a divided Second Circuit panel, I may silently applaud the circuit judge wise enough to understand I had gotten the case right, but my judgment is as vacated as it would have been by a unanimous panel. The more important present point is that the award was signed by Murphy, the independent Chairman, so the award may fairly be regarded as "a decision by an independent tribunal."

Moreover, as in *Collins*, issuance of the arbitration award was preceded by "an evidentiary hearing"—in the case at bar, an extended hearing featuring testimony, documentary evidence, and opportunities for cross-examination that stretched over twelve separate days, before a panel of arbitrators receptive to considering whatever evidence the parties wished to place before them. *See* Arb'n Award 2. The parties each filed post-hearing briefs, and Gaynor additionally filed a post-hearing reply brief. *Id.* Conduct of the arbitration in this case consumed considerably more energy than in *Collins*, where "the arbitration board conducted three days of hearings, at which appellant [the plaintiff] was represented by his union and evidence was received. Thereafter, the arbitration board issued a reasoned fourteen-page opinion[.]" 305 F.3d at 119.

The sixteen-page majority award in Gaynor's case reflects the extent of the evidentiary record generated by the arbitration. The award lists and discusses ten separate "allegations of retaliation" Gaynor made against Meriden and Chief Cossette. Arb'n Award 5–10. The award describes the evidence adduced with respect to each claimed act of retaliation against Gaynor, either at earlier administrative proceedings or during the arbitration hearings, and rejects each claim on the merits. *Id.* A recurring theme in the award is the majority arbitrators' conclusion that Gaynor was not a credible witness. *Id.* The award sums it up:

> This case is about a dishonest employee. This case is about a senior employee in a paramilitary organization who created a number of allegations against the Chief . . . which he knew were false, or recklessly added them to the litany of allegations with no concern whether they were false or not.

Arb'n Award 13–14. The arbitration award expresses the majority arbitrators' conviction that "the pattern of conduct exhibited by the grievant would not be corrected by a demotion,

re-training[,] or a disciplinary suspension without pay," and concludes: "The termination of Patrick Gaynor was for just cause." *Id.* 15.

Gaynor does not accept the arbitrators' rejection of his credibility, and professes that he "can establish that the labor arbitration decision was wrong as a matter of fact," as that concept is expressed in *Morel*, 124 F. App'x at 672. Pl.'s Obj. to Defs.' Mot. to Suppl. 3. I accept the sincerity of Gaynor's outrage—to be terminated in this fashion after twenty years of Police Department service vexes the human spirit—but the problem Gaynor faces in litigation is that his contention the arbitrators got it wrong is based on factual assertions the arbitrators considered on their merits and rejected in a reasoned award. Critically, Gaynor does not point to any procedural deficiencies in the arbitration itself. *Cf. Beaton*, 2018 WL 1276863, at *5–6 (giving great weight to an arbitration award where the court found the award was based on substantial evidence; plaintiff "was represented by counsel, and presented evidence and testimony on his behalf[;]" and plaintiff did "not claim that the arbitrator was in any way biased or impartial"); *Chan v. Donahoe*, 63 F. Supp. 3d 271, 298–99 (E.D.N.Y. 2014) (declining to give weight to an arbitration award where the arbitrator "refused to consider background evidence probative of plaintiffs retaliation claim" that fell outside a statute of limitations period). Moreover, a principal reason for the award was the arbitrators' assessment of Gaynor's credibility, a factor a reviewing court would not be inclined to disturb. *Cf. Young*, 2009 WL 498933, at *9 (finding "highly probative" the arbitrator's conclusions regarding, among other things, the plaintiff's credibility, where the arbitrator conducted two days of hearings including testimony from plaintiff and five other witnesses).

The only supposed errors in the arbitration award to which Gaynor points concern the following: (1) whether Gaynor was denied authorization to enroll in the training course; and (2) whether Gaynor alleged specific examples of retaliatory conduct in his September 2016 complaint or merely stated, generally, that Jeffry Cossette "engaged in a pattern of retaliatory conduct toward officers who he believes were responsible for bringing an incident involving his son, a former police officer, to light." Pl.'s Obj. to Defs.' Mot. to Suppl. 2, 4.

With respect to the first supposed error, that Gaynor was never denied authorization to enroll in the training course, Gaynor appears to be making a fine-grained and ultimately immaterial distinction: that even though Jeffry Cossette had, on multiple occasions, denied Gaynor's requests to participate in that training, at the time when Gaynor actually enrolled in the training, Gaynor was in the position of acting Director of Emergency Communications and therefore, while still subordinate to the Chief, Gaynor technically had authority to authorize the $4,165 training expenditure. *See* Defs.' 56(a) ¶¶ 4–5; Pl.'s 56(a) ¶¶ 4–5. For this reason, Gaynor argues that he "did not submit a request to attend the class through Chief Cossette" but "enrolled in the course under his own authority." Pl.'s 56(a) ¶ 5. Gaynor's own Complaint initiating this action listed, as a form of retaliation, Cossette's "denial of critical training and advancement opportunities." Compl. ¶ 15. The record and Gaynor's own concession establish that even though Gaynor had the legal authority to authorize the expenditure—such that his act did not rise to criminal misappropriation of public funds—the arbitration panel did not err in finding that "Cossette . . . denied the training opportunity." *See* Arb'n Award 4. As a result, Gaynor's act of signing himself up for the course was, indisputably, an act of "insubordination[.]" *See id.* 8.

According to Gaynor, the arbitration panel's second error was in stating that his September 2016 complaint enumerated the ways in which Cossette allegedly retaliated against

Gaynor, rather than generally recounting Cossette's "pattern of retaliatory conduct." Pl.'s Obj. to Defs.' Mot. to Suppl. 4. This is another distinction without a difference. Gaynor's position, apparently, is that the enumerated instances of retaliation emerged elsewhere, including in Gaynor's supplement to the September 2016 complaint and in the investigations by attorney Paula Anthony, Christopher Fry, and Charles Reynolds. *See* Defs.' Exh. E, Independent Investigation for City of Meriden ("Defs.' Exh. E") 1, ECF No. 55-7. Even if Gaynor's account is correct, it would do little to help his argument that the complaint is protected speech. Rather, it would support Defendants' argument that the complaint merely contained "conclusory allegations of widespread misconduct or systemic abuses," which are insufficient to elevate speech regarding a purely personal grievance into speech on a matter of public concern. Defs.' Reply 4 (quoting *Beamon v. Yale-New Haven Hosp., Inc.*, No. 3:16cv181 (JBA), 2017 WL 969266 (D. Conn. Mar. 13, 2017)).

Similarly, the degree of detail contained in the September 2016 complaint has little bearing on the arbitration panel's analysis of whether Gaynor was fired for just cause, as the initial investigation into Gaynor's conduct was predicated not on Gaynor's allegations against Jeffry Cossette (in fact, the investigation preceded his complaint, Defs.' Exh. M, 18, ECF No. 62-1) but on Gaynor's enrollment in the training course without permission. *See* Defs.' 56(a) ¶ 6; Pl.'s 56(a) ¶ 6. Gaynor does not and cannot dispute that by the time of Paula Anthony's investigation, he had enumerated the specific allegations discussed in the arbitration award. *See* Defs.' Mem. 9. As a result, this alleged oversight by the arbitration panel fails to shake my confidence in the integrity of the panel's decision and findings of fact.

The Court acknowledges that the panel's decision does not precisely address the federal and state constitutional questions at issue in this case. For instance, a determination that Defendants violated Gaynor's First Amendment rights depends, per *Cotarelo*, on findings "(1) that the speech at issue was protected; (2) that [the plaintiff] suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Cotarelo*, 460 F.3d at 251. In the First Amendment context, as discussed above, Defendants will still prevail if they can show that they "would have taken the same adverse employment action 'even in the absence of the protected conduct.'" *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994) (quoting *Mount Health City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287). Contrast this constitutional inquiry with the questions before the arbitration panel: "Was the termination of Patrick Gaynor for just cause? If not, what shall the remedy be?" Arb'n Award 2. These questions, of course, differ from the constitutional ones. However, the arbitration panel's findings of fact are highly probative of the federal and state constitutional questions at issue here.

At this time, the Court need not resolve the contested issues of whether Gaynor's speech—in particular, Gaynor's internal reporting of the Evan Cossette video, Gaynor's September 2016 complaint, and Gaynor's supplement to that complaint—is protected by the federal and state constitutions. Defendants assert colorable arguments that these forms of expression are not protected. In their view, Gaynor's internal reporting of the video constitutes mere reporting of "misconduct . . . up the chain of command" pursuant to a public employee's official duties, rather than speech as a citizen. *Carter v. Inc. Vill. of Ocean Beach*, 415 Fed. App'x 290, 293 (2d Cir. 2011); *see also Garcetti*, 547 U.S. at 418. Defendants also argue that Gaynor's September 2016 complaint and supplement constitute either (1) reporting of miscon-

duct pursuant to his official duties, or, in the alternative, (2) "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment[.]" *Miller v. N.Y.C. Dept. of Educ.*, 71 F. Sup. 3d 376, 383 (S.D.N.Y. 2014); *see also Beamon v. Yale New Haven Hosp., Inc.*, No. 3:16-cv-181 (JBA), 2017. Gaynor said he filed his September 2016 complaint against Jeffry Cossette "[r]ight after[,]" or "[a] couple hours" after, Cossette opened the internal affairs investigation against him, Defs.' Exh. M, 18, a fact that tends to support the conclusion that Gaynor's complaint was motivated by personal dissatisfaction with the conditions of his employment, and not by the general interest of a citizen in a matter of public concern.

Even under the more expansive protections of the Connecticut Constitution, the Court would be inclined to give great weight to the arbitration panel's findings that Gaynor's complaint was riddled with "baseless" allegations and "demonstrated reckless disregard for the facts." Arb'n Award 6–10. Were the Court to address this question, these credible factual conclusions of the arbitration panel would likely eliminate any genuine issue of material fact as to whether Gaynor "satisfied high standards of responsibility in the ways he" expressed his internal complaint, as required by the Connecticut Constitution. *Trusz*, 123 A.3d at 1228.

Notwithstanding these compelling arguments, the Court can presume, for purposes of this opinion, that these speech acts of Gaynor are constitutionally protected. So is, indisputably, Gaynor's participation in the federal investigation and trial of Evan Cossette. *See* Defs.' Mem. 18 (conceding this point); *see also Lane*, 573 U.S. at 241 (protecting truthful sworn testimony by a public employee).

The Court therefore turns to the second prong of the *Cotarelo* analysis: whether Gaynor suffered an adverse employment action. *Cotarelo*, 460 F.3d at 251. "To establish a genuine issue

of material fact with regard to whether a particular action constitutes an adverse employment action in the First Amendment retaliation context, a plaintiff must show that the retaliatory action 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Rivers v. N.Y.C. Hous. Auth.*, 176 F. Supp. 3d 229, 250 (E.D.N.Y. 2016) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d. Cir. 2006)). The parties agree that Gaynor's termination constitutes an adverse employment action. Defs.' Mem. 29. What remains in dispute is whether the other acts Gaynor alleges also constitute adverse employment actions. These acts include the following:

1. Jeffry Cossette's denial of training and promotion opportunities to Gaynor; giving Gaynor an unfair performance evaluation; and removal of Gaynor from the lucrative "snow-tow" assignment, which came with overtime pay. Compl. ¶ 15; Arb'n Award 6–7.

2. Jeffry Cossette's December 2014 order that Gaynor "no longer speak to the media." Compl. ¶ 16.

3. Jeffry Cossette's September 1, 2016 initiation of an investigation into Gaynor alleging that Gaynor "insubordinate[d Cossette's authority] and misappropriate[d] funds" by enrolling in a costly training course after Cossette had denied him permission to do so. Compl. ¶ 17. To avoid a conflict of interest, the hearing in this investigation was overseen not by the police chief, Jeffry Cossette, but by a specially hired independent consultant, Charles Reynolds (described by the arbitration panel as "a highly experienced [former] police chief . . . who has worked on the Oversight Commission for Police Reform in Northern Ireland, for the Department of Justice Civil Rights Division working on consent decrees, and [is] currently working for a federal judge in Oakland, California,

monitoring the compliance with that city's negotiated Police Department consent decree"). Arb'n Award 4–5.

4. Gaynor's placement on administrative leave beginning on September 2, 2016 during the pendency of that investigation, including his being escorted from the police building in front of other employees. Compl. ¶ 20. (Gaynor briefly returned to active duty in November 2016. Compl. ¶ 22.)

5. City Manager Guy Scaife's initiation of a second investigation into Gaynor's conduct after attorney Paula Anthony, hired by Meriden to investigate Gaynor's accusations against Jeffry Cossette, concluded that Gaynor's accusations were unsupported by, and, in many cases contradicted by, the totality of the evidence Anthony reviewed. *See* Defs.' Exh. E 1; Arb'n Award 5–6. This second investigation was led by Sergeant Fry and, again, culminated in a hearing overseen by Reynolds. Arb'n Award 6.

6. Scaife's decision to place Gaynor on administrative leave for a second time, beginning on December 19, 2016, during the pendency of the second investigation. Compl. ¶ 22.

The Court concludes that under the caselaw, none of the alleged instances of retaliation amounts to adverse employment action—nor, for that matter, do they amount to adverse employment action even when considered collectively. The most serious of the alleged actions, placement on administrative leave during an internal affairs investigation, "does not, without more, constitute an adverse employment action." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006). Nearly every one of the other alleged instances of adverse employment action was characterized in the arbitration panel's decision as false, baseless, or made in bad faith. *See* Arb'n Award 6–8. The denial of certain training opportunities here cannot constitute adverse

action, particularly where Gaynor *was* able to take advantage of other opportunities for training and, despite having "access to review all training records to support or undermine his claim . . . in being denied training as compared to other officers," Gaynor "failed to do so; no disparity in training opportunities existed." Arb'n Award 6; *cf. Rivers*, 176 F. Supp. 3d at 254; *Miller v. Ithaca*, No. 3:10-cv-597 (TJM), 2012 WL 1977974, at *5, *7 (N.D.N.Y. June 1, 2012). Gaynor's removal from the occasional snow-tow assignment, with its concomitant opportunity to receive overtime pay, would also not "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Rivers*, 176 F. Supp. 3d at 250 (internal quotation marks omitted). This is particularly so when the snow-tow assignment—which consists of the "simple task of arranging vehicles to be towed during a snowstorm to allow for plowing"—"was historically handled by a police officer" rather than a manager receiving Gaynor's relatively high captain's salary. Arb'n Award 6. Finally, Gaynor's claim that he was issued a "gag or-der"—amounting, in fact, to a reminder to comply with the Department's media poli-cy—likewise cannot amount to an adverse employment action. Arb'n Award 8.

The only plausible adverse employment action Gaynor alleges is his termination from the Police Department on June 26, 2017. Assuming but not deciding that all of Gaynor's speech acts described above were protected, the Court now turns to whether Gaynor's speech was a motivating factor in his termination, as required by *Cotarelo*. *See* 460 F.3d at 251.

No genuine issues of material fact exist as to whether Gaynor's speech was a motivating factor in his termination. To the contrary, it is clear that Gaynor's termination stemmed from careful review of his actions through multiple independent processes outside the control of Jeffry Cossette. These include outside counsel's review of Gaynor's allegations, City Manager Scaife's

referral of Gaynor's case for investigation, and two hearings overseen by independent consultant Charles Reynolds.

Several factual issues prevent Gaynor from successfully raising a triable issue of fact in this regard.

First, Gaynor presents no direct evidence of retaliatory animus by Jeffry Cossette or other city officials.

Second, while temporal proximity may indirectly prove causation when no direct evidence exists, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), Gaynor faces an insurmountable factual hurdle here: Evan Cossette's conviction on June 4, 2013 predated Gaynor's termination on June 26, 2017 by more than four years, and predated the initiation of the first internal affairs investigation into Gaynor and Gaynor's placement on administrative leave by more than three years. As the Supreme Court noted in *Breeden*, "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Id.* (affirming summary judgment for employer and citing with approval cases where three-month and four-month periods were found to be insufficient to indirectly prove causation) (internal quotation marks omitted). "Action taken (as here) [much more than] 20 months later suggests, by itself, no causality at all." *Id.*

Third, Cossette *promoted* Gaynor to Communications Director in 2016 during the very time period when Gaynor claims Cossette was retaliating against him by denying him opportunities for professional growth in the form of training and overtime. Defs.' Reply 7.

Finally, Gaynor's termination was the result of a process almost entirely outside Cossette's control. While Cossette initiated the first internal affairs investigation into Gaynor's conduct, the second investigation was initiated by City Manager Scaife and was predicated on Scaife's receipt of a report by outside counsel that raised serious concerns about Gaynor's cavalier attitude to the truth in his September 2016 complaint. *See* Defs.' Exh. E 1; Arb'n Award 5–6. Aware of the possibility of a perceived conflict of interest, Jeffry Cossette took careful measures to distance himself from any involvement in the Gaynor matter. Defs.' Reply 7. Cossette brought in an independent consultant, Charles Reynolds, to oversee the two internal affairs hearings into Gaynor's conduct, and Scaife ultimately had sole responsibility for agreeing with Reynolds's recommendation and terminating Gaynor. As the arbitration panel found after twelve days of hearings on the matter, "There was no demonstration that the Chief in any way attempted to steer or bias the process, or Reynold[s]'s ultimate recommendation, or the City Manager's agreement with that." Arb'n Award 17.

Gaynor states, without providing any supporting facts, that the internal affairs investigator, Sergeant Christopher Fry, was "Cossette's inside man" and that the investigation was somehow "tainted." Pl.'s Opp'n. 7, 19. The Record does not support Plaintiff's claims and without more, these bare accusations are insufficient to present a genuine issue of material fact. Even if the accusations were true, their probative value would be severely limited by the fact that both internal affairs investigations were reviewed by an independent consultant—whom Gaynor acknowledged in his own testimony was an "independent overseer[,]" Defs.' Exh. M 18—and, ultimately, had their findings ratified by the arbitration panel. *See* Arb'n Award 14–15.

As a result, Gaynor fails to make any showing of a genuine issue of material fact regarding whether his protected speech was a motivating factor in his termination.

For these reasons, I conclude that Gaynor cannot overcome the probative effect of the adverse arbitration award on his federal and state constitutional claims. In *Collins,* the Second Circuit held that a plaintiff confronting an adverse arbitration award could "survive a motion for summary judgment" in subsequent litigation on the same issues by presenting "strong evidence that the decision was wrong as a matter of fact," a concept the court immediately qualified by saying "e.g. *new evidence not before the tribunal,*" 305 F.3d at 119 (emphasis added), a limitation the Second Circuit repeated in *Morel*.

Gaynor does not make that showing in this case. Gaynor does not argue that the error in the arbitrators' decision is revealed by evidence that was not before them. Rather, Gaynor contends principally that the arbitration tribunal misunderstood, disregarded, or wrongfully rejected evidence that was introduced during the arbitration hearings. That is an entirely different proposition, which runs counter to the effect the Second Circuit gives to reasoned arbitration decisions.

The consequence is that the arbitration award in this case has the probative effect described in Second Circuit cases like *Collins* and *Morel*, which form the governing law on this motion by Defendants for summary judgment. That law requires that the motion be granted and Plaintiff's complaint be dismissed with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment, ECF No. 55,

is GRANTED. The Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

The Clerk of the Court is directed to close the file.

It is SO ORDERED.


Dated: New Haven, Connecticut
        April 18, 2022




                                                    */s/ Charles S. Haight, Jr.*
                                                    CHARLES S. HAIGHT, JR.
                                                    Senior United States District Judge